STATE, EX REL. BOARD OF HEALTH OF THE TOWNSHIP OF
NORTH BRUNSWICK,

*v.*

SAMUEL LEDERER et al.

1. The board of health in the township in which a nuisance exists or is car-
ried on has the authority and it is its duty to abate such nuisance, either on
its own motion or by the aid of the court, though it is only hazardous to the
health of individuals residing in another township.

2. Carrying on an offensive trade for twenty years in the same place, remote
from buildings and public roads, does not entitle the owner to continue it in
the same place after houses have been built and roads laid out in the neigh-
borhood, to the occupants and travelers upon which it is a nuisance. In such
cases, prescription, whatever the length of time, has no application. Every
day's continuance is a new offence, and it is no justification that the party
complaining came voluntarily within its reach.

3. Every citizen is presumed to enjoy a normal condition of mind and body
until the contrary is shown.

4. Where it appears that the odors and gases from a fat-rendering establish-
ment produce headache, nausea, vomiting, and compel citizens to close their
doors and windows, both by day and at night, and interfere with them in the
enjoyment of their meals and of sleep, such establishment is a nuisance, and
it is the duty of the boards of health, in such cases, to take proper measures
for its abatement.

On bill to abate a nuisance.

*Mr. John S. Voorhees*, for the complainants.

*Mr. George C. Ludlow*, for the defendants.

BIRD, V. C.

The business of the defendants, which the complainants seek
to restrain, is what is commonly called fat-rendering. It is car-
ried on in the township of North Brunswick, in the county of
Somerset, and within a short distance of the line dividing the
said county from the county of Middlesex. There are only
three or four houses within a few hundred feet of the establish-

ment in the county of Somerset, and two or three several hundred feet further away, while there are a great many dwelling-houses occupied as such in the county of Middlesex and in the city of New Brunswick within a few hundred feet of the place where this business is carried on.

It is insisted that the board of health of the township of North Brunswick has no authority to proceed against the defendants for any nuisance hazardous to public health, in case it appears that the threatened mischief is only likely to affect the inhabitants residing in the said county of Middlesex. This is put upon the ground that jurisdiction is statutory and is limited to the township which creates the board of health. It is true that its jurisdiction is so limited. The board of health of any township can only proceed to abate a nuisance existing or carried on within its own boundaries. But to my mind it is very clear that, whenever the public health is threatened by such a nuisance, whether those who comprise the public live upon one side of an imaginary line or another, the board of health in the township where such nuisance is located has committed to it the duty of removing the nuisance or of asking the aid of the court to that end.

But in this particular case the judgment of the court is not dependent upon any such question of jurisdiction, for the half dozen or more dwelling-houses within the township of North Brunswick are sufficiently within the reach of the mischief, not only to claim but to demand the attention of the public authorities. Whether they be many or few, no higher obligation can rest upon the court than to protect them in their health in case it be ascertained that it is in danger.

It is also strenuously urged that the defendants have had possession of the premises complained of for at least twenty-eight years, and for all that period of time have been carrying on the tanning of hides and rendering of fat, and are consequently entitled to the protection of the court, notwithstanding the hazard to public health may be ever so great. Courts will be very slow to yield to such a proposition. An acknowledgment of the principle claimed would practically give to the defendants

Board of Health *v.* Lederer.

and others dominion over a very much larger extent of territory than it would be actually necessary for them to own in order to conduct their business, provided they had occupied the premises beyond the prescribed statutory period which prohibits actions to be brought by individuals.      In the case of *Commonwealth* v. *Upton, 6 Gray 473,* the court said : "Carrying on an offensive trade for twenty years, in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of and travelers upon which it is a nuisance." *People* v. *White Lead Works, 9 L. R. A. 722; People* v. *Cunningham, 1 Den. 524; Fertilizer Co.* v. *Hyde Park, 97 U. S. 668; Mills* v. *Hall & Richards, 9 Wend. 315; Pottstown Gas Co.* v. *Murphy, 39 Pa. St. 257; Renwick* v. *Morris, 7 Hill 575; Wood Nuis. § 18; Dygert* v. *Schenck, 23 Wend. 446; Sloggy* v. *Dilworth, 38 Minn. 179.*

But since the public is interested, I think the maxim, *"Nullum tempus occurrit regi,"* announced and maintained in *Cross* v. *The Mayor, &c., 3 C. E. Gr. 311,* should control the case before me.

In addition to this, very high authority has said : " In such cases, prescription, whatever the length of time, has no application.     Every day's continuance is a new offence, and it is no justification that the party complaining came voluntarily within its reach.     Pure air and the comfortable enjoyment of property are as much rights belonging to it as the right of possession and occupancy." *Fertilizing Co.* v. *Hyde Park, supra; Wells* v. *New Haven and Northampton Co., 151 Mass. 46; Sloggy* v. *Dilworth, supra;* in note to *Chicago and Eastern Railway Co.* v. *Loeb,* see principles in harmony with this view, *59 Am. Rep. 353, 354; Hargraves* v. *Kimberly, 53 Am. Rep. 130, notes.*

It was likewise very earnestly insisted that the persons affected by the odors emitted from this establishment were in feeble condition of health by nature, or of abnormal physical characteristics; in other words, possessed of some idiosyncrasy which cast them beyond the protection of all laws of a general nature, or which are enacted for the public welfare.      I think that the utmost use which can be made of this argument is in reference

to persons who are peculiarly sensitive to odors or sounds, and which affect them seriously and in a radically different manner from which the great mass of individuals are affected, it being quite difficult, if not impossible, for the law to provide adequate safeguards against all the imaginary ills which arise in the minds of the eccentric, or those of morbid habits or tastes. But this condition of mind or body must be established by clear proof. It cannot possibly have reference to that large class in every community that are less robust, or are more feeble in body, or less capable of resisting deleterious influences from without, than many, or it may be a majority, of their neighbors. All citizens are presumed to enjoy a normal condition of mind and body until the contrary is clearly shown. My attention was directed to *Westcott* v. *Middleton, 16 Stew. Eq. 478,* which was sustained in the court of errors and appeals. See *S. C., 17 Stew. Eq. 297.* Westcott sought to restrain Middleton from conducting the business of an undertaker on the premises of the latter, which adjoined the residence of the former. The proofs showed that Westcott had a dislike amounting almost to a horror, of everything pertaining to the burial of the dead. I can discover nothing in that case which is so similar to the one under consideration as to influence me.

The case before me is radically different from the one cited. A large number of witnesses were in open court and were sworn in the presence of the defendants, and were cross-examined by their counsel. There was nothing in their appearance or the manner of delivering their testimony which indicated any peculiar idiosyncrasy or abnormal condition whatever. The very astute and learned counsel made no attempt whatsoever to satisfy the court, by his cross-examination of these witnesses, that there was the slightest difference between them and the great majority of mankind. It did not appear that there was any predisposition in any of them to sickness or feeble condition of body. Twelve or thirteen witnesses who live within a few hundred feet or a few hundred yards of the said fat-rendering establishment were more or less affected in bodily condition or health by the foul and unpleasant odors created at and issuing from said

establishment. Several of these were made sick at their stomachs thereby ; others were not only made sick in a similar manner, but such sickness was followed by vomiting; others at their meals were not only made sick, but were obliged to leave their tables. Some of these and others were disturbed during the night by the intensity of the odors. The sleep of not a few was interfered with because they were obliged to close their windows in order to keep the smell from their rooms, which in warm weather made their rooms so uncomfortable that their sleep was disturbed. That these odors are extremely foul and unpleasant at very frequent periods is established by the most incontestable proof.

Dr. Alonzo C. Hunt, inspector of the state board of health, was called as a witness. He had visited these premises several times and had ample opportunity to observe the nature of these odors. He spoke of the effect of these odors upon the general health as being manifested directly and indirectly. In the first place he said :

" Directly, its effect upon the senses, it is likely to produce nausea and dizziness, and in some people, diarrhœal troubles and headache, and loss of appetite ; and indirectly, in the general effect of these conditions upon the health of people, in lowering the general condition of vitality, thus exposing them to attacks of disease to which they succumb readily."

Dr. Donihue, a member of the board of health of the city of New Brunswick, has been frequently in the immediate vicinity of the defendant's place of business and has had excellent opportunity to notice the odors complained of. He was asked to give his opinion as to the effect of these odors and gases upon the public health, and his answer was :

"All odors and gases tend to destroy health;  *  *  *  they are capable of producing nausea, headache, dizziness and a general feeling of fatigue, but they are not causes capable of producing any infectious disease in the human body. The decomposition of animal and vegetable matter are causes which produce these odors and are a menace to the public health, because it is very liable to be infected with disease germs, and so spread the particular disease with which it is infected, along the whole vicinity where the decomposing animal matter is situated, but the odors themselves are not capable of pro-

ducing noxious diseases in the human body; nor are these odors noxious except as the particular germs are applied to the particular disease in a particular locality."

In speaking of the multiplication of these germs he said :

"I do not believe the mind is capable of conceiving how rapidly they do multiply. If I said millions a second, it would be very close to it."

Dr. Wright was called by the defendants. He has had fifteen years' experience in the practice of medicine in the city of New Brunswick and in the locality of the business complained of. It is his judgment that these odors are not hazardous to the public health. He seems to rely upon the fact that the locality has been quite as healthy as any other during his acquaintance therewith. He says, however, that at Dr. Woodbridge's, which is about five hundred yards distant, he has noticed the odors, and that they were "dreadful."

Dr. Long, who has practiced his profession in that locality for twenty years, says these odors have never been hazardous to the public health, and that "locality has been healthier than any other portion of the city."

The result of this testimony is that these odors do distinctly and seriously affect the health of many persons who are of normal condition both of mind and body. The theories of the doctors differ, and may be said to appear at least to be in conflict. But while the facts, from a general standpoint, coincide with those who say that the locality has been equally healthy with any other, and so sustain their theory, the particular facts, which have been above given somewhat in detail, emphatically and most conclusively sustain the theory of the medical experts called by the complainant. The latter do not say that any disease of a pestilential or violently destructive character has resulted from these odors. They simply say that they are of a character so to affect or influence the human system as to prepare the way for diseases, and that they will cause nausea, headache, diarrhœal troubles and are a menace to good health ; and all of these afflictions have visited many of the witnesses and have been produced by these odors.

In my judgment, the case presented is fully within the provisions of the statute. The board of health did its duty in filing the bill and in asking the aid of the court. ´ They are the guardians of the public health, and the action of the legislature would be quite superfluous in creating boards of health if they were obliged to wait until it should be demonstrated by actual experiment to what extent such odors were capable of affecting health or destroying life.

After what has been said in the case of *Board of Health of the City of Lambertville* v. *Butterfoss,* which had the sanction of the court of errors and appeals (*13 Stew. Eq. 325*), and in the case of *Board of Health of the Township of Hamilton* v. *Niedt & Matthews, 19 Atl. Rep. 318,* it will be sufficient for me to say that in all these cases where boards of health ask the aid of this court they do so by virtue of the statute which extends its power so far as to inquire whether nuisances, sources of foulness or causes of sickness hazardous to the public health exist or not. The interpretation given to the statute by these cases shows that the inquiry is limited to the determination of questions relative to the public health, and that there must be proof of danger, peril or risk, or something equivalent thereto, to justify the court in lending its aid, and that when this is made manifest the statute prescribes what the court shall do. In addition to the cases cited, see, also, *People* v. *Detroit White Lead Works, supra.*

Until very recently the defendants did their rendering in uncovered cauldrons, and since the fat could only be effectually separated by the highest possible degree of heat, the escape of the noxious odors and gases was in the highest degree excessive. They sought to entirely overcome this by the introduction of such devices or improvements as from time to time have been suggested. The separation of the fat therefrom is accomplished by putting the crushed bones and other matter in an enclosed vat or cauldron. This greatly, if not entirely, prevents the escape of the odors or gases during the steaming process. But all this matter, while it is still at a very high temperature, is exposed to the air in passing from such vat or cauldron to other

receptacles for the more thorough separation of the fat from the solids, and after this exposure other mechanical contrivances of recent discovery are used to perfect the work of rendering, and which do to a large extent accomplish the object in view and prevent the escape of the objectionable odors and gases. But it is undoubtedly true that while the mass is passing from the first receptacle to the second, it is so exposed as to throw off an incalculable amount of odor, most offensive because of the intense heat to which it has just been necessarily subjected. The defendants called two experts as witnesses, who testified that in their judgment the defendants might introduce additional improved machinery which would greatly reduce the escape of gas and odors.

Having come to the conclusion above expressed, it certainly follows that, as long as this condition of things continues, the establishment must be considered a nuisance—a source of foulness, a cause of sickness and hazardous to public health—and should be enjoined until it can be carried on without disclosing those objectionable features.

But the testimony discloses another condition already alluded to, resulting from the operation of this fat-rendering, which is equally if not decidedly more hazardous to public health, which will necessarily continue to threaten the health of the community even though the foul odors just spoken of, and which are directly engendered by the process of rendering fat, should be entirely overcome. I refer to the condition of the brook spoken of, produced by the discharge of so much solid matter, together with the refuse liquid which is carried into the brook and which lodges along its banks and upon the stones and rough places in the bottom, and forms large sheets wherever the water eddies or is at rest. If the presence of such an immense mass of corruption, of decaying animal matter, which process is always hastened by the heat of the sun, be not hazardous to the public health, then all our sanitary legislation and all municipal regulations to that end are simple works of supererogation. While this mass may be, from time to time, carried away with high water, yet when drought continues it accumulates day by day

and necessarily for long periods of time the exhalations there-from are extremely offensive.   Therefore, it is manifest that the use made of this brook by the defendants is as certainly subject to the condemnation of the law as the rendering establishment itself, if not more so ; and that .it will not satisfy the demands of the public to effectually obviate the generation of the odors at the establishment itself, but that such demands extend to the prevention of the use of the brook in question, as a conduit for the refuse matter discharged in the process of rendering.

That I may not be misunderstood, it is proper to observe that, in coming to these conclusions, I have had regard to the rights of the public only, under the statute referred to, and have not in any sense considered the rights of individuals who may have suffered by any annoyance, or inconvenience in their persons, or in their homes, or in damages by the depreciation of their prop-erty, because of proximity to this alleged nuisance.

The complainant is entitled to costs.